defendants of the premise, pardon me while we have them, defendant of the premise, Mr. Sherry Silver, pardon me while we have them, plaintiff albany, Mr. Steven Ross. Good morning, your honors. May it please the court, my name is Sherry Silver and I represent Lucien Hurt for the office of the state appellate defender. Your honor, there were two arguments that were raised in Mr. Hurt's brief. The first of the issues deals with the trial court's refusal to allow Dr. Sherry Berkowitz, who was an expert in eyewitness identification testimony, to testify at trial. The second of the issues deals with the situation that arose with juror number 278. I'd like to start with the second of the issues, mainly because it's something that we don't see very often and it's a little bit more interesting, I think, quite honestly. I'd like to start this by reading exactly what the note said that was passed to the judge. The situation that arose with juror 88. You're getting that out of the transcript. Yes, and I meant to say this and I meant to actually drop a footnote in the brief and I didn't. At the time that I was preparing the brief, I contacted the circuit court clerk, I contacted Eric Reinhart, who was defense counsel. I believe our paralegal at the office contacted the prosecutor and perhaps even the judge's chambers. Nobody knew where the note was. So it's fortunate that the judge read verbatim what the note was into the record. So again, what happened was juror 88 overheard juror 278 make a comment. He relayed that comment to the bailiff and then the bailiff wrote it down and the note went to the judge. So the note says that juror 88 overheard juror 278 comment that, and I quote, she was afraid of the defendant because he was staring at her, period. Further, that juror 278 may have said that, and there's a character that, she feared the defendant may seek her out to do harm, period. Apparently, according to juror 88, a prior juror was dismissed for similar fears. We can knock off that last sentence. We all agree that that didn't happen in this case. We don't know where that came from from juror 88. But the reason I'm reading this into the record right now is because the state in their brief sort of mischaracterizes what the note says. The second sentence of their first paragraph of this issue says juror 88 expressed concerns that another juror may have said that she was afraid of the defendant because he stared at her. They assigned the word may to what was a more declarative statement in that written note. But the judge made inquiries, isn't that correct? The judge made inquiries, but not the necessary inquiries. The judge didn't ask the exact question. Correct. But doesn't the judge have a responsibility to certainly elicit whatever bias there might have been, but also not to make too much of a situation so that the jurors, the rest of the jurors, or those jurors are too focused on that? I agree that it is a delicate balance. The question that would... It's a better way to put it. But in fact, the judge didn't ask any of the other jurors. He only asked juror 88 and 278 and not even the necessary question. Well, but as far as the necessary question, the judge did ask whether upon juror 278's return to the courtroom, the court asked her, did you express out loud to anyone that you had some concerns about anything of or pertaining to anything about this case? Now, wouldn't that question have alerted or elicited the response if indeed the statement had been made? Not necessarily. That question is pretty vague, and that's how I think we phrased it in the reply brief, that do you have any concerns about anything? It could mean the air conditioning situation, the situation in the jury box. What if somebody made some statement to you? But if she's uncomfortable expressing that, and the state says it would be unsettling for the judge to have asked the direct question, and certainly it would be unsettling, but it still needed to be asked. They needed to get to that juror's state of mind to understand whether or not she was going to be biased. And this vague question about anything, that could be, like I said, it could be concerning the environment that she was in, sitting in the air conditioning or sitting in the heat or whatever the situation was. Would it make any difference if the juror had said he's black and I hate blacks? I believe that would have made a difference, yes. That would have showed some bias, yes. No, what I mean is if that had been a statement, would the judge have had to be more precise in his questions? In other words, kind of like Paul's graph, in other words, what's the nature of the beast and how egregious is it? Is it something that requires cross-examination akin to Terry Mason? No. Or does it, as in this case, appear to be such a generalized statement that it could cover most of the galaxy and possibly intergalactic situations? I think there's somewhere in between those. That if the question is open enough that intergalactic situations might arise, who knows what the judge would have been getting at? It's important to focus the question, but again, with a delicacy that was needed. And in here, the judge didn't even do that. He did, I will admit that he did ask, there's a question in here, during the course of the jury selection, it's at page 1083, was there any type of comment that you may have made concerning Mr. Hurt, Mr. Reinhart, Mr. Humke, Mr. DeRue, anything at all concerning any of the evidence in the case? And that's the primary word here, the evidence. Was the judge getting at, have you already decided the case on evidence that hasn't even been presented? They didn't even have open statements yet. So focusing that, that question actually could be parsed out into many different questions if you really look at it. But the focus of was, did she make any conclusions as to the evidence? That's not the point. The conclusion is that she had a state of mind because apparently the defendant was staring at her. You're saying basically the question should have been directed at the persona or the defendant individually and not at the evidence? In other words, do you have any concerns about this particular individual defendant? Yes, that's exactly what the question should have been. And that's exactly what Mr. Reinhart proposed. The judge asked the attorneys to give them, to give the judge proposed questions. Mr. Reinhart wrote them down and we have them written into our brief at page 39 of the brief. Amazingly, the defense attorney and the prosecutor agreed that those were the questions that needed to be asked. And the prosecutor even expanded on it. He wanted to ask questions that would have gotten into her tone of voice. That would have been important to know. Was she mumbling under her breath? The juror 88 was sitting close enough that he may have heard her. Or did she say it loud enough that other jurors in the box could have also been tainted by the comment? Does the level of interrogation, is it dependent on a credibility assessment of the reporting juror? I think it probably does. And in preparing for the argument today, I kept thinking about when I was a kid and we had sleepover parties. And we had the game, the telephone game. One person said, whispered something to somebody's ear and then they went to the next person. And you saw how much it changed all the way down the line. It's very possible the juror 88 overheard a comment from juror 278, relayed what he believed that comment was to the bailiff. The bailiff wrote it down in a way that he or she, I can't remember if it was male or female, thought was the way that it was relayed to him and then it went to the judge. But what really happened? The only way that the judge could have figured that out is by asking the necessary and reasonable questions to determine what was said. The judge didn't do that. But our standard of review is abusive discretion. Yes, it is, Your Honor. And to determine that, you have to look at these three disconcerting factors. The first is that the judge would not ask any of the proposed questions that the attorneys gave him. He refused to ask really the one necessary question that would have brought out the juror's state of mind, juror 278's state of mind. And he refused to excuse juror 278. Juror 278 should have been taken off the jury. And we did say that juror 88 also should have fallen on the sword on that. We know that it wasn't preserved and that Eric Reinhart really didn't say anything about juror 88. So we really are focusing on 278. That was preserved in the motion for a new trial. He did refer at one point to juror 279, but clearly it was just a typo. But there were two alternates sitting in the wings waiting to get on. There were alternates already picked. Yes. The prior day. Yes. This was strictly prior to opening statements. That's when this happened. So there were two alternates sitting in the wings. They could have brought one of those alternates back on, and there still would have been one alternate available, ready in case something else happened during the course of the trial. So the court has general questions. You believe it was abuse of discretion for the judge not to ask the specific question. To not ask the specific question and to not ask any of the proposed questions that were given to him and to not remove juror 278. So for those reasons, we ask that the conviction be reversed and the case remanded. If there's no more questions on that issue. The first issue. Oh, sorry. I think you left out a point, and that was that some of the questions, or at least one of the questions that was asked was a misdirection in the sense that it went to the evidence which wasn't even argued or presented to the jury and which should have been directed at the subject of the alleged comment, which was fear of the defendant. And so if you don't ask questions, and the questions you do ask are about, what do you think of the sale over at the Jewel? Instead of asking, are you afraid of the defendant? A misdirection or a question that is really not on point is. An abuse of juror. Inconsequential. So it seems to me that you left out that point when you responded to the question about what are the points that you're arguing constitute an abuse of discretion. You're absolutely correct. Because it's not just failing to ask any questions, it's asking questions that misdirect the focal point. Absolutely. And that's, I thought I had touched on that, but that's a much better way of putting it. I'm sorry. Sorry, Your Honor. So, yes, that goes to also the abuse of discretion. As for the first argument that was raised, it again deals with the trial court's refusal to allow Dr. Berkowitz to testify. Everybody pretty much agreed Dr. Berkowitz was qualified. Nobody disagreed with that. And she would have testified as to the acquisition, retention, and retrieval of information that goes to an eyewitness identification. Yes? Why isn't this just harmless error? Let's assume it was a mistake. Should have let him testify, but where's the prejudice? The state argues that the evidence is overwhelming, so it's harmless. Set that aside. How about accountability? The accountability issue? Yes. Okay, the trial court puts himself there, know there's three, whether he was one of the would-be perpetrators or he's in the car driving, quote, the getaway car. So why isn't this harmless here? Because there's mere presence. If he's there sitting in the car, mere presence is not going to be sufficient in and of itself. There's nothing else that ties him to the offender. Isn't the car moving towards the? Well, that's pretty curious when you think about it. It's very curious. My question is, if this is accountability, whoever the guy in the car is, whether it's your client, let's assume for the sake of argument it is, he's accountable for the other two, the eyewitness testimony somewhat pales. Do you agree with that? No. Because the fact is this case relied on that eyewitness identification. That's all. And it's important for the jury to have had all of the information available to it in its deliberations to determine whether or not maybe Savino looked at the wrong person jumping into the driver's seat of the car. Maybe Savino was wrong. Tony Savino was wrong that the car was actually moving. If you look at who got out of the car from where when the car was actually stopped, Mr. Hurt was in the back seat. How could he possibly have been driving that car? Well, but he admitted to one of the officers, certainly, that he was in the car. Right. He said it was Hotchkiss. And there's no objection to the accountability and obstruction. No, but there were objections in the closing argument. When the State was trying to argue about the legal responsibility, and backing up just a little bit, at the beginning of the case, the State's theory was that Lucian Hurt was the primary actor with Squire. Everybody agreed Squire was involved. So it was Mr. Hurt with Squire. That changed as the case went on, and their closing argument did focus on legal responsibility. So it was over-objection also. Mr. Reinhart was objecting right and left about that type of an argument. So there was no objection to the instruction itself. Well, that's true. But to the argument there was. In order to establish harmless error, don't you have to establish that the defendant wasn't proven guilty beyond a reasonable doubt as to accountability? Yes. And there's not enough evidence to show that he was guilty beyond a reasonable doubt. He was sitting in the car. Whether he was sitting in the front seat, back seat, it doesn't matter. He was sitting in the car, according to him. He was just sitting in the car. Was there any evidence that he attempted to disassociate or distance himself from the defendants, the other defendants? No. But where was he going to go? He's living in Highland Park, and according to Eric Reinhart, not that it came in his evidence. I don't think it came in his evidence. He lived in Mainwood. Where was he going to go? How was he going to get back to Mainwood? What was he going to do? He could have. He didn't leave the car, though. I suppose he could have gotten out of the car when the police arrived, but what good would that have done? He could have put a paper bag over his head. If he had one, Your Honor, yes. If there was one in the car, yes. If there's no more questions. Basically we're saying that it was an abuse of discretion to not allow Dr. Berkowitz to testify. Her testimony was necessary, and we ask that you reverse and remand. Thank you. You'll have an opportunity to make rebuttal. Thank you. Mr. Rogers. Good morning, Your Honors. Counsel, may it please the Court. My name is Stephen Rogers, and I represent the people of the state of Illinois. Since counsel went with the second issue first, I will do the same. The state's position is that last sentence is important because there was a clear misstatement there, and it showed that Juror 88 had a misunderstanding of a part of the case that no juror had been dismissed for fears. And so whether there was a comment between Juror 278 and another juror during juror selection, maybe it related to a prior experience, maybe it related to something they saw on the TV show. But that last sentence, to me, is very important. The judge immediately said, I find this note vague and ambiguous. Juror 88 had tried to contact him. Let's stop right there. Yes, ma'am. The judge looks at the note and is like, this is vague. How about we bring the bailiff in? Sir, you know, I've got a court reporter here. Can you tell me exactly what Juror 88 said to you? Wasn't that from the get-go somewhat of an abuse of discretion? If you think the note's vague, find out what was said. Your Honor, that would have been a possibility. The judge opted to bring both jurors in, the juror that conveyed the information and then the juror that the allegation was made of. And it's unclear what type of conversation the judge had with the bailiff, if he just took the note and got the note delivered on his desk or if there was any discussion at the time. The judge did note that jury— outside the presence of the two attorneys. Isn't that a whole other issue? Yes, Your Honor. And so there was nothing on the record. We would have to assume there was no inquiry. Yes, Your Honor. The bailiff handed over the note and said there was this discussion. Okay. Part of the complaint about asking a more specific question is at the beginning of ordeer, defense counsel asked for open-ended questions because it was a more conducive environment to get responses. And whenever juror 278—I mean, she specifically says, I can still be fair and impartial. I have formed no opinion. Now, the statement—the question that was tied to the evidence, you know, that may have been a misdirected question. But then the follow-up question once juror 278 is brought back in is, I believe, do you have any concerns of anything pertaining to this case? And so this was kind of a get-out-of-jail-free card for juror 278. If she was nervous, if she had thought, I'm really uncomfortable at this point, say something. She didn't even need to be that specific to defend the mysterium. She could have said, I'm really uncomfortable at this point. I don't know that I can, you know, give a fair trial. What's your interpretation, perspective, definition of abusive discretion? Well, on the first issue, it's arbitrary or unreasonable. I think it would be—in some cases, it's failure to make the—failure to gather sufficient information. I know there's one case where a concern is brought up and the judge just said, we're going to disregard that. Let's move on. That's an abusive discretion, not asking questions. The judge had a valid concern. The case has talked about this cold-record concern that, you know, when you're reading something after the fact, it might be very concerning, but the trial judge at the time was making the credibility determination, watching the juror. If juror 278 is staring at the judge and saying, I have no issues. I can be fair and impartial. I have formed no opinion, it's the trial judge's— But isn't that always in reference to the case and the evidence, not the defendant? Well, Your Honor, and Rob, I mean, the language is unbelievably discretionary. And they even talk about this getting too specific. Sometimes less is more. There are a lot of statements. If, in fact, after she had said, I have formed no opinions, I have no concerns, if the trial judge stares at her and says, are you afraid of the defendant? Well, that, in fact, assumes that she did say that because she's just told the judge, I have no concerns regarding the case and that I can be fair and impartial. Wouldn't that have suggested, perhaps, to the juror that there might be a reason for that to be the case? Absolutely, Your Honor. If he follows up at that point and says, did you say you're afraid of the defendant? Now she's thinking, I have a reason to be afraid of the defendant. She's got to go at that point. My question was, did you say it, not whether you believed it. My question to counsel was, wouldn't that have suggested, even just asking that direct question, suggested to the juror there might be a reason to be afraid? Yes, Your Honor. It's either question, did you say that the defendant was staring at you? That means that someone out there thinks the defendant was staring at her. Are you afraid of the defendant? Did you say you were afraid of the defendant? That assumes that she did because she had just said I didn't make any comments regarding defendant, the different counsel, or anything pertaining to the case. But the only thing he doesn't ask about is the defendant. Is there anything about the case? Is there anything about the evidence, which, by the way, you haven't heard any of, and we recite Mr. So-and-so, the prosecutor, Mr. So-and-so, and so-and-so, the defense attorneys, never mention the word defendant or the defendant by name. The only thing the judge doesn't ask about is what's critical. How do we justify that? Well, Your Honor, the judge did mention defendant. I would have to look at the exact question, but I believe it was did you make any comments regarding defendant, and then he goes on to list, and I understand that's open-ended. And part of it is, I think, if you just say did you make any comments regarding defendant, you're getting into the ground where at least the judge felt would become unsettling, that the insinuation is you did, in fact, make the statement. And the other part is the issue now about other jurors should have been questioned, maybe someone overheard. I mean, Juror 88's responses were very vague. He didn't know who the comment was made to. He believed it was to someone else. No one else responded. I mean, if Juror 278's actually talking to someone and says, look, I'm really scared of the defendant he's been staring at me, you would think Juror 88 would say it was Bill or Shirley that was also over here in the jury box. In situations such as this where inquiry is made, is it the function of the judge interrogator to make determinations of credibility, make findings of fact, possibly conclusions of law in order for review to be made of the things that occur at the trial court level for purposes of determining whether or not prejudicial error arose? Yes, Your Honor. So tell me how that happened in this case. Well, Your Honor, right at the outset, the judge stated the standard, whether the juror had a fixed opinion and could not be fair and impartial. The trial judge goes through the inquiry, and at the end he says, counsel both stated they could be fair and impartial and form no opinions. And the judge made the statement. I had to take them at their word, but I think what that means, without any lack of credibility on their parts, because the trial court said the same thing in Ron. There was certainly misbehavior. A juror had been cheering. A juror had repeated a state's attorney's comment that was objective to and sustained. Clearly not something a juror should be talking about. Nonetheless, the trial court there did not even question the jurors. And then after a second incident, the jurors brought back in, and the juror admitted to throwing his notes out of frustration, and then the trial judge said, well, have you formed any opinions? He says, not completely. And then the trial judge says, I'm going to take him at his word that he's still open to hearing this case and deciding it fairly and impartially. And the Supreme Court said, this is a judgment called by the trial court. And the facts in that case, to me, are more alarming, because it happened on multiple occasions. Now, had this gone back and the next day a jury said, look, she's really trying to convince other people that a defendant's guilty or any other misconduct, that might be problematic. But here is the single isolated note. If the trial judge was correct that this is a vague, ambiguous note, he was at least satisfied that Juror 278 could be fair and impartial. But I think after making the adequate inquiry, that was not an abusive discretion. How about this to sort of gild the lily here. Both sides say, Judge, we would like this juror excused. And he says no. Your Honor, that was a misrepresentation of what the state said. The defense says, let's excuse jury. The state said, or 278, the state says, we want 88 out. And then. You want both out. Well, first says, we want to excuse 88. Then I think defense counsel says, does the state agree? And the state said, well, we have some issue with them working together. We're fine with both being out. And then the judge says, okay, are you fine with both being out? And defense says, absolutely not. We want 88 on the panel. Then the trial judge goes in to kind of an independent analysis, because that's what defense asked for. We're not running a harmony group. We'll argue individually. So the trial judge says, I asked the questions. I think both can be fair and impartial. Now, the state doesn't then come back at the time and make any clarification. The motion for a new trial, the state says, look, we have no concern about the impartiality of 278. We just said potentially they wouldn't be able to work together. And so what you've described sounds to me like a negative pregnancy. You know what that is? No, Your Honor. In a complaint, if you claim that somebody owes you $10 and they say, we don't owe you $10, then you can get a judgment for $999, because they have to deny not only that they owe you $10, they're supposed to also deny that they owe you anything. And when you said what you said, the state said it. The state never said the total denial, which was, we don't want 278 gone. In other words, there should have been an additional statement made if you apply the maxim or the rule, principle, doctrine, whatever, relative to a negative pregnant to the situation. The state should have said, we don't want 278, period, or if you don't remove both of them, then they shouldn't remove, you shouldn't remove either of them or neither of them. Yes, Your Honor. And the state absolutely could have done that. They didn't clarify. But I was just laying out the exact factual basis to say the state never agreed on Juror 278 specifically. Now, they did agree that both of them could go based on a concern that they couldn't work together. But it also went fairly quick, because once the judge realizes that the defense is split and they want one out, one in, then the defense makes a brief argument about, basically out of caution, we need to get rid of Juror 278, and then the judge makes a decision. So it's unclear what opportunity the state had. Clearly the judge didn't ask the state at that point to make an argument on either of the jurors. Nor did the state volunteer it. No, the state didn't. If there are no other questions on Issue 2, I'll quickly address Issue 1. With respect to Issue 1, I have a question. Yes, Your Honor. What is there about this case and the facts of it that doesn't bring it within the Lerma decision that it was error to exclude the expert testimony? Well, I think maybe the biggest point is this was not a misidentification claim as against the whole population. This is a misidentification claim as to a person that is with you at the scene of the robbery. And so, you know, with Lerma, we don't know where the defendant's at. He could be miles away. He could have been in his house asleep. There's no way to tell. And so really in a case like that, the only way to attack the state's case is to present the eyewitness identification expert. But why wouldn't it have been helpful to the jury here then? Well, Your Honor, I don't think the state would say it would have been of zero help. But I agree with the judge that there would have been very limited value based on the facts of the case because from about 20 minutes prior to this robbery until about an hour after the robbery, nearly every fact is none. We know these three people are in silver cars circling. We know Squire goes up to the pizza place door and starts asking if the joint is open. He says none. He goes back. McFarland walks past Hotchkiss. And this is either the defense says it's moments, the state says it's minutes, five to ten minutes. And then Hotchkiss is gone. Sugarman then comes out of his store. He's approached by one of these individuals. He says that's defendant. The robbery then occurs. The two people jump in a moving car, speed away. They say which way they're going. The police cut them off at about a mile. The stop actually occurs two miles later after a slow speed chase. And that's unlike almost any other case where a defendant is not saying, well, I wasn't there. It could have just been someone that looked like me. The defendant is actually saying it was someone in the car with me. And as was alluded to in the harmless error analysis, they're around this pizza place for quite a while. They've got gloves, a crowbar. There's a gun in the glove box. The place isn't open. I mean, as the justices alluded to, what is the defendant doing if he's really innocently sitting in the back? Why is he with these guys? And the defendant makes a mistake. Your Honor, I see my time is up. May I briefly finish? Yes. Please finish. Your Honor, he says during this altercation, I am in the car with Hotchkiss. Hotchkiss is in the car. That's the state's case. Hotchkiss is the getaway driver. When the defendant's questioned, and it actually wasn't even a question. The defendant just offered the statement. He says, well, when this occurred, I was in the car with Hotchkiss. Well, certainly, that's the only innocent explanation is that Hotchkiss is driving. I'm right here. And so if Hotchkiss was really committing the robbery with Squire, I'm as befuddled as defense stated in the brief. Why in the world would he say that I'm in the car with Hotchkiss? I have one more question. Yes, Your Honor. I believe Justice Jorgensen asked Ms. Silbern about how is this not harmless error if, in fact, accountability, the accountability verdict applied. And so would you like to comment about the issue and anything that Ms. Silbern said that you might want to take issue with? Not specifically. I mean, the accountability instruction was given. The state's case was that all three played their own individual parts in this case. And so in the brief, we made the harmless error argument that even assuming the defendant's right that he's in the car, this is a moving car that then speeds away from the scene. So being as clear, someone jumps in the back, someone jumps in the passenger seat. And so it doesn't leave much doubt that he was not innocently sitting in the back when all this occurred. And so even if the trial judge should have allowed it, there's overwhelming evidence of defendant's guilt in this case. Thank you. And we would respectfully request that this court affirm the defendant's conviction. Thank you. Ms. Silbern? Thank you. Returning to state property, that's nice, right? One of the questions that was asked of counsel was, what is your definition of abuse of discretion in terms of the first argument? And counsel said the failure to gather sufficient information and making some ruling that's arbitrary and unreasonable. Well, that's the point. There was a failure to gather sufficient information on the first issue. The trial judge just simply did not ask the questions that would go to the heart of the issue, having nothing to do with the evidence, having nothing to do with the case. It had to do with the juror and the defendant. And those were the questions that needed to be asked. And, yes, there needs to be findings. I would argue that there do need to be findings of credibility and fact and possibly issues of law. And this record simply doesn't have it because the correct, necessary questions were not asked. I think there is a sufficient record here to say that the judge abused his discretion, but there's not a sufficient record to say he was completely wrong. You know, did that make sense? No, I said that backwards. You get the point. I think you did if you're attempting to represent the information. I said it backwards. I apologize. But you get the point of what I'm getting at here. There was not an adequate record here to work from because the questions were not asked. And that's the second part of that statement. I think counsel was referring to the Runge case with the juror A and juror B and the juror who threw the notes against the wall and all that kind of stuff. I just point out in that case that that juror ultimately was removed from the jury. When death penalty proceedings began, he was removed from the jury. So a little bit late, but he was removed. In terms of whether it's a misrepresentation of what the State said, it's true that the State never flatly said, yes, let's get rid of juror 278. But the prosecutor never said, let's not get rid of 278. And he essentially agreed that juror 278 should go. And it was the prosecutor's argument that juror 88 should go, too. But we're falling on the sword, as I said before, about juror 88 because Mr. Reinhart didn't do anything about juror 88. But, in fact, the prosecutor did agree that juror 278, whether tacitly, vocally, or whatever, that was an agreement, that juror 278 needed to be taken off the jury. And the fact that there were alternates available, what would have been the harm? If an alternate was placed on the jury instead of 278, the problem would have been solved, and we wouldn't be here arguing this right now. As for the Lerma question that your Honor asked about in the first argument, there is no difference. This is very similar to Lerma. I'm not sure what counsel was saying about the witness or the defendant was far away. What happened was that two people were shot while they sat on a porch. And the shooting came from perhaps across the street or we don't – I'm not exactly sure, but it's not miles away. I mean, the defendant was there. And, in fact, the victim who died made a dying declaration to his father saying, lucky did it. And that's what the problem was that Dr. Falero was going to testify to the eyewitness information in that case. And he was going to testify about acquaintance identifications. And the judge went ahead and made the arbitrary ruling that, in his opinion, acquaintance identifications are to be relied on. Dr. Falero died, and then Dr. Loftus came along and gave another report, and the judge relied on the findings that he made concerning Dr. Falero. So then they went ahead. The Supreme Court said, no, we needed to get into this more and Dr. Loftus should have been allowed to testify because one of the reasons is the judge relied on his own opinion. That is also what happened here. The judge relied on his own research. What was he researching? He said he relied on testimony that had been heard at motions to suppress. He relied on some of the reports of Dr. Berkowitz and her testimony at the hearing on the motion, the state's motion in limine to bar her. But in fact, he added, I did my own research. On what? Did he research acquisition, retention, retrieval, the forgetting curve? What did he research? He also said he was relying on motions that were filed in other cases. By whom? What other cases? Was it cases that Eric Reinhart filed in motions? Were there cases that other attorneys filed in motions? What were the rulings in those cases? That's arbitrary and unreasonable. And if I may, I'd just like to quote here from the Lurva decision. If I may, paragraph 32 of the Lurva decision. We have in this case is the trial court denying defendants' request to present relevant and probative testimony from a qualified expert that speaks directly to the state's only evidence against him. That's the same as here also. And doing so for reasons that are both expressly contradicted by the expert's report and inconsistent with the actual facts of the case. Decision of that nature rises to the level of both arbitrary and unreasonable to an unacceptable degree. And for that reason, we're saying Lurva and this case are very similar. But in this case, there was, unlike Lurva, more than identification testimony. There were some keys that were found. There was a statement that the defendant made to one of the officers, at least admitting that he was one of the ones in the car. So it was a little bit different, was it not? But the defendant's statements, if you look at them, in the state's brief, in their statement of facts, they relate the evidence that came in at the motion to suppress, which the trial judge said that he relied on. Officer D. Basilio, pronunciation of that, he testified at that motion to suppress hearing that the defendant, when they were pulled from the car, was saying, what are we being stopped for? What's going on? And he said, or I guess he was told that they were described as being involved in this incident. And the defendant said, yeah, I can see Squire doing something like that. That was his statement initially. At 3 o'clock in the morning, six hours later, after being Mirandized, then he says he's sitting in the car with Hotchkiss. And for whatever reason, who knows, he's given an alibi to his friend or whatever the deal is, that doesn't make him guilty.  The other part of that was, you asked another part of that question. Well, sir, the keys. Oh, the keys. Who knows? Who knows who threw those keys? It could have been that Squire and Hotchkiss are the ones that committed the offense. They had the keys. Defendant's sitting in the back seat asleep at that point. Who knows? And they throw out the keys from the front window. We don't know what happened. The keys were found in a yard, supposedly on the route that was followed. We don't really know what route they followed. The slow-speed chase did not follow them through the residential area. It followed them up Green Bay Road. That's where they were picked up by the police. So there's not overwhelming evidence here. There's nothing. And unlike some of the other cases that the state cites, there's no DNA evidence. Ortiz had DNA evidence. Anderson had physical evidence. And the officers who were involved observed the defendant commit the shooting. They gave chase. They lost him for a moment. And then other officers found him wearing the same clothes that the original officers saw him in. There was also, I believe, some gunshot residue on gloves that they saw the defendant throw down. So there was a lot of physical evidence in those other cases. There's nothing here. There's just nothing. And it all relies on the identification testimony. And the defendant is entitled to present evidence that would support his position. And that's what it comes down to. He was denied that opportunity. Thank you. We'll take the case under advisement. There are other cases on the call, so I'm going to take a short recess. Thank you.